ANDREA T. MARTINEZ, Acting United States Attorney (#9313)
MARK E. WOOLF, Assistant United States Attorney (WA#39399)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone:  (801) 524-5682
Email:  Mark.Woolf@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> $28,000 in U.S. Currency; and <br><br> $9,000 in U.S. Currency, <br><br> Defendants *in rem*. | Case No. 2:21-CV-00749-DBB <br><br> COMPLAINT <br><br><br> Judge David Barlow |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America states this *in rem* action for forfeiture alleging as follows:

## NATURE OF THE ACTION

1. This is a judicial forfeiture action under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C) seeking forfeiture of the Defendant Property, which is more particularly described in Paragraph 8 herein.

2. The Defendant Property is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it (1) was "intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act

of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

3. The Defendant Property is further subject to forfeiture pursuant to 21 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from "proceeds traceable" to an offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7)(A), incorporating a violation of 18 U.S.C. § 1952 through 18 U.S.C. § 1961(1)(B).

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this is a civil action commenced by the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. 1355(a) because this is an "action or proceeding for… forfeiture[.]"

5. This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b) and (d).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1355(b)(1)(A) because the District of Utah is "the district in which any of the acts or omissions giving rise to the forfeiture occurred[.]" Venue is proper pursuant to 28 U.S.C. § 1395 because (1) the forfeiture accrued in this district, and (2) the Defendant Property may be found in this district.

## PARTIES

7. Plaintiff is the United States of America.

8. Defendants *in rem* (referred to as "Defendant Property" throughout this Verified Complaint) are more particularly described as $28,000 in U.S. Currency and an additional $9,000 in U.S. Currency seized by law enforcement at the Salt Lake International Airport.

9. The Defendant Property was seized on or about June 15, 2021 by the Drug Enforcement Agency ("DEA") from Michael Dos Santos and Manny Dos Santos (jointly referred to throughout as the "Dos Santos Brothers"), who were traveling through the Salt Lake International Airport. The Defendant Property remains in the possession of the DEA, and it has been deposited into DEA's high value evidence vault.

## FACTS SUPPORTING FORFEITURE

### Initial Investigation in New York

10. On or about June 15, 2021, the Dos Santos Brothers arrived at John F. Kennedy Airport in New York City, New York ("JFK Airport") for their flight to Portland, Oregon. While going through security, Manny Dos Santos told Transportation Security Administration ("TSA") personnel that he was traveling with a large amount of cash of around $18,000.

11. TSA security personnel informed DEA of the significant cash disclosure.

12. Thereafter, DEA Special Agent LoGrande made contact with Manny Dos Santos prior to Dos Santos' departure from JFK Airport, whereupon Dos Santos agreed to speak with Special Agent LoGrande. During that interaction, Dos Santos informed Special Agent LoGrande that he was traveling with approximately $20,000 cash in his fanny pack.

13. Manny Dos Santos consented to Special Agent LoGrande searching the fanny pack. Upon finding the bundle of cash, Special Agent LoGrande informed Manny Dos Santos that it appeared there was significantly more than $20,000, resulting in Dos Santos revising his prior statement and saying that he was actually traveling with approximately $25,000 cash.

14. Manny Dos Santos further disclosed that he was traveling with his brother, Michael Dos Santos, on the same flight, and that Michael Dos Santos was also traveling with an unknown quantity of cash.

15. Upon indication from Manny Dos Santos that he needed to leave so that he did not miss his flight, Special Agent LoGrande returned the cash and Dos Santos boarded his flight. Thereafter, Special Agent LoGrande contacted the DEA's Salt Lake office, where the Dos Santos Brothers had a lay-over, to alert law enforcement about the Dos Santos Brothers' arrival. Task Force Officer Scott Brummer ("TFO Brummer") received the information.

## Salt Lake International Airport

16. Upon receipt of the information, TFO Brummer confirmed that the Dos Santos Brothers would be arriving at the Salt Lake International Airport at approximately 10:00 a.m.

17. Prior to the Dos Santos Brothers' arrival, Brummer conducted a background check on each brother, discovering that both had a criminal history: Manny Dos Santos for drug possession and Michael Dos Santos for robbery.

18. At 9:25 a.m., TFO Brummer and other law enforcement personnel responded to the Salt Lake International Airport gate where the Dos Santos Brothers flight was scheduled to arrive.

19. Upon arrival, passengers began deplaning at approximately 10:06 a.m. Manny Dos Santos deplaned approximately five minutes before Michael Dos Santos.

20. Brummer and other law enforcement personnel immediately noticed that the Dos Santos Brothers deplaned at different times, understanding this to mean that the Dos Santos Brothers, although traveling across the country together, likely did not sit together on the plane.

### Interview of Michael Dos Santos

21. TFO Martinez and TFO Marshall approached a male passenger who matched the description of Michael Dos Santos shortly after he deplaned. The TFOs identified themselves and asked whether they could speak with Michael Dos Santos, who confirmed his identify and consented to speak with the TFOs.

22. Michael Dos Santos told law enforcement that he had a connecting flight to Portland, Oregon. This information was confirmed by Dos Santos' boarding pass. Dos Santos further told law enforcement that he had previously been stopped and questioned at JFK Airport regarding the cash he was carrying.

23. Michael Dos Santos explained that he often carries large amounts of cash to gamble, and that he was not concerned with losing the money or being robbed while traveling.

24. Upon inquiry from law enforcement, Michael Dos Santos stated he ran his own clothing business with his brother Manny Dos Santos. During the course of the interaction, a trained drug dog alerted to Michael Dos Santos' carry-on luggage, which was located on the floor next to him. As a result, Michael Dos Santos consented to the search of his carry-on luggage. Law enforcement did not find currency or drugs in the carry-on luggage.

25. Thereafter, law enforcement inquired as to where Michael Dos Santos kept his cash, whereupon Dos Santos pulled a large fold of currency, wrapped in a rubber band from his pants pocket.

26. Michael Dos Santos was unsure of the amount of cash he was carrying, but he indicated his belief that it was about $19,000. Agents later determined Michael Dos Santos carried $9,000.

27. Dos Santos reiterated that he carries significant cash so that he can gamble, indicating he thought he had a gambling problem. Dos Santos also indicated that he was interested in opening a marijuana dispensary as a future business.

28. Based upon their training and experience, law enforcement personnel know that those who transport the proceeds of illegal drug trafficking often keep the proceeds in cash on their person or accompanying bags or suitcases.

### Interview of Manny Dos Santos

29. TFO Brummer and another law enforcement officer independently approached Manny Dos Santos after he deplaned, whereupon Manny Dos Santos consented to speak with law enforcement.

30. Manny Dos Santos confirmed he had been stopped in New York, telling law enforcement that he was traveling with around $28,000 in his fanny pack. Upon questioning, Manny Dos Santos stated that he intended to use the cash to buy a home and possibly a store front in Portland, Oregon, but Dos Santos stated that he did not have a realtor because homes were always coming available. Manny Dos Santos only planned to be in Oregon for three days.

31. When asked about his employment, Manny Dos Santos stated he ran an online clothing business, showing law enforcement an Instagram page that showcased men's clothing. Dos Santos stated that the business did not have a license in New York or any other jurisdiction. Law Enforcement asked Dos Santos about the identity of vendors who supplied the clothes, and he answered that the clothing came from a warehouse, but Dos Santos could not provide a name or address for the supplying warehouse. Dos Santos further stated that he was not paying taxes for the business, nor could he provide any additional information on the business or its operation.

32. Thereafter, TFO Brummer left the area where Manny Dos Santos was speaking with law enforcement to speak with Michael Dos Santos.

33. TFO Brummer asked Michael Dos Santos about the business he ran with his brother Manny. Michael Dos Santos stated that they had a clothing business licensed in the State of New York, but he was unable to provide any information regarding the business license, informing TFO Brummer that an individual named Oliver handled all their business interests.

34. Upon request, Michael Dos Santos provided a phone number for the individual he identified as Oliver. TFO Brummer attempted to call the number but was sent both times to a voicemail indicating that the subscriber had not set up the voicemail. Michael Dos Santos stated Oliver was likely not home, and he could not provide any additional information on an office or business location for Oliver.

35. TFO Brummer then returned to Manny Dos Santos, who again stated the Dos Santos Brothers did not have a business license. TFO Brummer informed him that his brother had indicated they did have a business license, whereupon Manny Dos Santos changed his story and claimed that the brothers did have a business license. Manny Dos Santos did not respond when asked to provide any further information or individual, other than his brother, that could confirm a business license.

36. When TFO Brummer asked Manny Dos Santos about the individual named Oliver previously identified by Michael Dos Santos, Manny Dos Santos indicated that Oliver was a business associate. Manny Dos Santos could not provide a number for Oliver but was able to reach Oliver on his cell phone.

37. With Oliver on the line, Manny Dos Santos consented to permitting TFO Brummer to speak with Oliver and handed him the phone. TFO Brummer identified himself and, upon request, was informed that he was speaking with an individual identifying himself as Oliver. Oliver told TFO Brummer that the Dos Santos Brothers ran a licensed clothing business and a recording studio in New York, but he could not provide basic information regarding the businesses, including where they might be registered. Nor could Oliver identify provide any basic information regarding the

businesses finances or the banking institution used by the businesses, claiming that he did not have access to the requested information because was not at his home. Oliver was unclear why law enforcement personnel had stopped the Dos Santos Brother considering he had just returned on a flight from the Dominican Republic with $10,000 in cash without questioning from customs or TSA. TFO Brummer thanked Oliver for the information and gave the cellphone back to Manny Dos Santos.

38. TFO Brummer then asked Manny Dos Santos about the recording studio, and Manny claimed that he and his brother were involved in that business as well. He could not provide any information regarding a financial institution used by the business.

39. Through his training and experience, TFO Brummer is aware that drug and money couriers often state that their business ventures are cash businesses and are unable to provide basic information verifying their alleged business interests.

40. Law enforcement personnel informed the Dos Santos Brothers that they had no further questions. The Dos Santos Brothers were further informed that the cash was being administratively seized.

41. Based upon the interaction with the Dos Santos Brothers, Law enforcement personnel had probable cause to believe the cash was either derived from the sale of controlled substances, and/or intended to be used to purchase controlled substances given the knowledge that individuals involved in the illegal drug trade often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing commercial airlines.

42. Law enforcement placed the seized cash into two DEA evidence bags, and the Dos Santos Brothers signed as witnesses. The evidence bags were then sealed, and a

receipt presented to the Dos Santos Brothers, along with TFO Brummer and other law enforcement personnel's contact information. The Defendant Property was then transported to DEA's Salt Lake office and into the high value evidence vault.

43. Later that morning, TFO Brummer received a call from the Dos Santos Brothers' attorney, who indicated that he believed an error had been made and requested the Defendant Property be returned. TFO Brummer explained the basis for the administrative seizure, explained the formal forfeiture process had begun, and explained the Defendant Property was currently in evidence with the DEA. TFO Brummer later provided a copy of the cash receipt to the Dos Santos Brothers' attorney.

44. The DEA began administrative forfeiture proceedings regarding the Defendant Property, and the Dos Santos Brothers, through counsel, filed an administrative claim for the full amount of the Defendant Property.

**FIRST CLAIM FOR RELIEF**
21 U.S.C. § 881(a)(6)
(Conspiracy to Distribute a Controlled Substance)

45. The United States incorporates paragraph 1-44 as though fully set forth herein.

46. The Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq.* (the "Controlled

Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

47. Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [21 U.S.C. §§ 841(a)(1) and 846], all proceeds traceable to such an exchange, and all moneys negotiable instruments, and securities used or intended to be used to facilitate any violation [thereof]" are subject to forfeiture to the United States. *Id*.

48. Section 841(a)(1) establishes that it is unlawful "for any person to knowingly or intentionally…distribute, or dispense, or possess with intent to…distribute or dispense, a controlled substance…" *See* 21 U.S.C. § 841(a)(1).

49. Section 846 further provides that "[a]ny person who attempts or conspires to commit any offense defined in [21 U.S.C. § 841(a)(1)] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *See* 21 U.S.C. § 846.

50. The Dos Santos Brothers were traveling from New York to Portland, Oregon with a total of $37,000 cash on their persons and, upon consensual questioning from law enforcement, were (1) unable to identify a verifiable legal source for the cash, (2) unable to provide basic information regarding the alleged businesses they claimed to be operating, (3) had inconsistent reasons for their joint trip, (4) changed their stories multiple times, (5) deplaned at separate times despite traveling together, (6) were alerted to by a law enforcement drug dog, (7) were unaware of the amount of cash they were

traveling with, and (8) had criminal histories, including drug possession by Manny Dos Santos.

51. Accordingly, the Defendant Property is subject to forfeiture under 21 U.S.C. § 881(a)(6) as property "intended to be furnished" in exchange for a controlled substance, "proceeds traceable" to the sale of a controlled substance, or funds "intended to be used to facilitate" the purchase of a controlled substance.

## SECOND CLAIM FOR RELIEF
18 U.S.C. § 981(a)(1)(C)
(Interstate Travel in aid of Racketeering Enterprises)

52. The United States incorporates paragraphs 1-51 as though fully set forth herein.

53. The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because "any property, real or personal, which constitutes or is derived from proceeds traceable to … any offense constituting "specified unlawful activity" is forfeitable to the United States.

54. The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

55. The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under …section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

56. Section 1952(a) describes the following as an indictable act:

    (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to-

    (1) Distribute the proceeds of any unlawful activity; or

    (2) Commit any crime of violence to further any unlawful activity; or

    (3) Otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

18 U.S.C. § 1952(a).

57. Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving … narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]".

58. Based upon the facts outlined herein, there is reasonable belief to believe that the Defendant Property traveled in interstate commerce in violation of 18 U.S.C. § 1952(a) and/or (b), and is therefore subject to forfeiture under 18 U.S.C. 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 1952.

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts there is reasonable belief that the Defendant Property, listed above, is forfeitable to the United States under 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6) and requests:

A. That notice of this action be given to all persons known or thought to have an interest in or right against the Defendant Property;

B. That the Defendant Property be forfeited and condemned to the United States of America;

C. That the Court decree, confirm, enforce, and enter an Order of Forfeiture as to the Defendant Property to the United States of America; and thus order the Drug Enforcement Agency, or other applicable federal agency, or their delegates, to dispose of the Defendant Property as provided by law; and

D. That the Court award the United States all other relief to which it is entitled, including the costs of this action and for such other and further relief as this Court deems just and proper.

Dated this 22nd day of December, 2021

            ANDREA T. MARTINEZ
            Acting United States Attorney

            */s/ Mark E. Woolf*
            MARK E. WOOLF
            Assistant United States Attorney

## VERIFICATION

I, Scott Brummer, Task Force Officer with the Drug Enforcement Agency, and declare under penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture *in rem*, and that the facts contained therein are based upon my personal knowledge or upon information I obtained in the course of my investigation and are true and correct to the best of my knowledge and belief.

Executed on this 21st day of December, 2021.

_____
Scott Brummer
DEA-TFO